# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR418-235 |
| | ) | |
| DESMOND HILL, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Desmond Hill was arrested on assorted drug and weapons violations on December 1, 2017, after law enforcement searched his apartment. Part of the Savannah-Chatham Counter Narcotics Team (CNT) search was performed without a warrant, after they knocked on the door and Hill permitted them to enter his residence. Later, they secured a warrant to search the home. Hill challenges the initial warrantless search, seeking to suppress evidence seized from the apartment because the initial search was done without his consent or, in the alternative, the scope of any consent he gave was greatly exceeded by CNT agents during their rummaging. Doc. 32. The Government opposes. Doc. 33. An evidentiary hearing was held on March 6, 2019, at which CNT Agent Otilio Rivera testified, bodycamera footage of the

search was reviewed, and a video recording of Rivera's search warrant application to the state court magistrate was also reviewed. *See* doc. 37 (admitting Government's Exh. 1 (bodycamera video) and defense exhibit 1 (warrant application video). The matter was then taken under advisement.

A.   BACKGROUND[1]

Hill's factual recitation refers to the affidavit and application for search warrant prepared by Agent Rivera, the veracity of which is unchallenged by defendant. Government Exh. 3 at 3-5; *see also* doc. 32, Exh. A. The affidavit explains that the Savannah Police Department had received "numerous drug complaints" about Hill's residence, advising that numerous vehicles were observed coming to and leaving from the apartment so their occupants could purchase narcotics and, sometimes, use the narcotics in the parking lot. Exh. 3 at 3. Prostitutes were also suspected to work out of his apartment. *Id*. On December 1, 2017, a call complaining of "a strong odor of marijuana" emanating from the apartment prompted Rivera to execute a "knock and talk" at the

---

[1]   The background is taken from Agent Rivera's affidavit and application for search warrant, as relied upon by defendant in his motion, *see* doc. 32, Exh. A, as well as the bodycamera and warrant application videos offered into evidence by the parties.

apartment. *Id.* at 4.

Upon arrival, Rivera too detected "a strong odor of marijuana" which he recognized "based on [his] training and experience." Gov't Exh. 3 at 4. When Rivera knocked on the door, a young male answered and, after informing Rivera that Hill was not at home, slammed the door in his face. *Id.* As Rivera began walking away, Hill then exited the apartment and spoke with Rivera about "the recent drug complaints, the odor of marijuana coming from inside the residence and [his guest's] behavior." *Id.* Hill admitted he had smoked marijuana a few hours earlier. *Id.*; *see also* Gov't Exh. 1 at 19:22:10. A canine contemporaneously conducting a free air search on Hill's vehicle alerted for the presence of narcotics. *Id.* Based on all these factors, Rivera sought — and state Magistrate Michael Barker approved — a warrant to search the residence and vehicle for narcotics. *Id.* at 1-4; *see also* doc. 32, Exh. B.

The bodycamera footage, which was admitted into evidence and also relied upon, unchallenged, by both parties, fills in the gaps left by the warrant application. When Hill first spoke with Rivera, Rivera told him that he wanted to "just look around and make sure there's nothing

illegal in the apartment." Gov't Exh. 1[2] at 19:22:10-14. Rivera assured Hill that if his worries were assuaged that he would "get out of here" and leave Hill to his day. *Id.* at 19:22:10:14. After learning that Rivera was there to search for marijuana, Hill affirmed that he was willing to go through "whatever" he "ha[d] to go through" to get Rivera on his way and repeatedly denied that there was marijuana inside the apartment. *Id.* at 19:23:17-19, 19:23:52. Rivera assured Hill "nobody's in any trouble" and offered that if he found nothing "illegal" in the apartment, he would "walk [expletive omitted] out." *Id.* at 19:23:04-14. Hill went inside the apartment, alone, to lock up his dogs, *id.* at 19:24:01-19:25:20, and then asked his family members to exit the apartment and escorted the agents inside, *id.* at 19:25:20-55.

As they entered the residence, Hill led Rivera directly to his bedroom and sat calmly as Rivera rifled through his belongings. Gov't Exh. 1 at 19:25:56-26:05. Rivera kept talking, keeping the tone conversational and light as he poked around. *See, e.g., id.* at 19:26:20-

---

[2] Time in Gov't Exh. 1, the bodycamera footage, refers to the time as indicated at the top right of the screen, which tracks the real time of the footage in military standard time zulu. The transcription is based on what the Court could discern from repeated review of the video, and reflects the Court's best understanding. Some audio was unintelligible given Hill's low, quiet voice, ambient noise, and the constant whining of dogs present in the apartment.

39:33.  Even when he saw a baggie of marijuana laying in plain sight on a pile of clothes, or opened a black baggie containing white powder and lighters, Rivera soldiered on with conversation and the search.  *Id.* at 19:26:30 & 19:28:45.  Hill did not stop him or question the scope of the search — indeed, more than once Hill spoke up to offer that items could be moved around to better search or others areas could be searched.  *E.g., id.* at 19:26:50-55 ("You can pull that back"); 19:29:13-14 ("Is there anywhere else you wanna look?"); 19:30:45 (informing Rivera that a firearm was hidden under the mattress); 19:38:40-44 ("You can pull out that stuff back there" from behind the television); 19:40:30-35 (opening a closed door, "Y'all want to look in here?" and encouraging officers to look).

Eventually, Hill objected that it had "been awhile" and that Rivera was "messing with [him]," apparently remarking on the oddity of such a search if he wasn't "in trouble."  Gov't Exh. 1 at 19:36:12-18.  Hill's discomfort with the situation reached a tipping point when Rivera asked him to memorialize his consent to the search in writing, though he clearly had affirmed that consent had been given.  *See, e.g., id.* at 19:45:01-12 (Hill: "What's this paperwork he going to get?" Agent: "So,

remember when we talked to you out front and you're like you can let us come in and search real quick?" Hill: "I mean, I did, 'cause I felt like I was forced to because I don't want it to seem like I'm doing nothing."); 19:49:03-08 (Rivera: "I was going to explain what this is.  You remember how you gave me consent to go ahead and search your house verbally?" Hill: "Yes I did.  I did that."); 19:49:40 (mentioning for the first time his objection that agents had "no warrant"); 19:54:50-54 ("I let y'all look.  What else do I gotta do?"); 19:55:52-56, 19:56:50-56 ("Y'all ain't have no warrant and I let y'all search and what else do I gotta do. . . . I ain't got nothing to hide.  Y'all looked through my room, the bathroom, the kitchen, the back room, like what else do you gotta do?").  Belatedly, the wheels began turning as Hill objected that he felt like the search had "gone too far." *Id.* at 19:55:00-02.

    Given Hill's refusal to sign the written consent to search, Rivera went outside (apparently) to draft and submit the warrant application. He then spoke with the state magistrate, who determined there was sufficient probable cause set forth within the warrant application to grant the search of Hill's residence and vehicle. Defense Exh. 1.  Even later, however, Hill again affirmed he had given permission to the agents

6

to search.  *See* Gov't Exh. 1 at 20:18:00-19:40 (expressing his objection to agents' continued presence in his home after he allowed them to search); *id.* at 20:20:50-54 ("I told them to go ahead and look and I let 'em look.").

## II.  ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure against unreasonable searches and seizures."  U.S. CONST. AMEND. IV.  Governmental intrusions into private dwellings without a warrant supported by probable cause are prohibited, subject only to a few carefully delineated exceptions.  *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Prevo*, 435 F.3d 1343, 1345 (11th Cir. 2006). Voluntary consent provides one such exception to the warrant requirement.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  "To be considered voluntary, consent must be the product of an essentially free and unconstrained choice."  *United States v. Zapata*, 180 F.3d 1237, 1241 (11th Cir. 1999) (quotes and cite omitted); *see Culombe v. Conn.*, 367 U.S. 568, 602 (1961).  Consent is not voluntary if it is merely "a function of acquiescence to a claim of lawful authority. . . ."  *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989).

### A. Consent to Search

Hill raises several arguments that his consent to the search was not voluntary. First, he contends that he did not give consent to the search of his residence, but instead "meekly" "acquiesced" to the agents' authority. Doc. 32 at 1, 8-11. Though he appears to concede that the initial "knock and talk" was permissible, Hill argues that any consent he gave was effectively involuntary. *Id*. But the bodycamera footage and Rivera's credible testimony dispute Hill's characterization. Hill was not under arrest, was not restrained, was not personally searched, and appeared at ease throughout the search as he actively cooperated. Agents did not demand entry to his home or display their weapons in a show of force or authority. No physical coercion, threats, promises, or misrepresentations that agents already had authority to search the premises were made.[3] *See Schneckloth*, 412 U.S. at 225-27 ("whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined

---

[3] Hill attempts to paint a very different picture, describing Rivera as "hulking" over him and agents blocking any exit, leaving him cornered and feeling compelled to cooperate. Doc. 32 at 11-11. He explains that he was "tricked" by Rivera's deceptive misrepresentation that he was only going to "look around" — a term that apparently falls far short of "search." *Id*. These contentions of intimidation, of course, are belied by the video and Rivera's credible, unrebutted testimony.

from the totality of the circumstances."); *United States v. Simms*, 385 F.3d 1347, 1355 (11th Cir. 2004); *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) ("In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances. . . . the court should look at several indicators, including the presence of coercive police procedures, the extent of the defendant's cooperation with the officer, the defendant's awareness of his right to refuse consent, the defendant's education and intelligence, and the defendant's belief that no incriminating evidence will be found."); *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Here, Hill cooperated with Rivera until drugs and several firearms had been uncovered, knew he had the right to refuse consent, as indicated by his later refusal to sign a written consent to search form, and does not argue that he was uneducated or unintelligent. *See United States v. Maddox*, 316 F. App'x 908, 913-14 (11th Cir. 2009). Under these circumstances, the Court should conclude that his consent was voluntary.

  Certainly, nobody told Hill that he could refuse to allow agents to search. Such a warning, however, is not required. *See United States v. Drayton*, 536 U.S. 194, 206 (2002) (unambiguously "reject[ing] in specific

terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search" and collecting cases); *c.f. Schneckloth*, 412 U.S. at 241 (while a consent to search must be voluntary, it need not be "an intentional relinquishment or abandonment of a known right or privilege"). "Although [Rivera] did not inform [Hill] of [his] right to refuse the search, he did request permission to search, and the totality of the circumstances indicates that [Hill's] consent was voluntary, so the search[ ] w[as] reasonable." *Drayton*, 536 U.S. at 207. In other words, Hill's consent to the search was voluntarily given and his later regret (and refusal to then sign a written consent form) cannot unwind it. Indeed, that later refusal militates against a finding of coercion and toward a finding that Hill "was not merely acquiescing to the actions of the officers." *United States v. Alim*, 256 F. App'x 236, 239 (11th Cir. 2007).

    Hill next argues, in the alternative, that even if voluntarily given, Rivera clearly exceeded the scope of his limited consent. Doc. 32 at 12. He contends that to the extent he acquiesced to the search, he only intended to allow Rivera to "look around" and "walk through" his

apartment. *Id*. But Hill accompanied Rivera through his rummaging without a single objection, offering instead encouragement that Rivera could search further. Even if the scope of the search expanded beyond what Hill anticipated when he first assented to it, he watched it continue to grow without the barest hint of protest (and, in fact, abetted its expansion.[4] His regret now does not make it unlawful. As his consent

---

[4]   The Court, indeed, was interested to see the extent of the search that Hill calmly watched unfold before him. Rivera picked up and opened various items, rifling through Hill's laundry (where marijuana was found), poking around and shaking out his shoes, opening a black plastic bag that, while not open, was not secured. Gov't Exh. 1 at 19:28:45 *see also id*. at 19:29:40-19:30:28 (agent wearing the bodycamera rifled through the closet). All of this occurred openly in front of Hill, who chattered with Rivera and failed to articulate any wish to halt the search. Though he complained it had gone on for some time, Hill did not ask Rivera or the other agents to *stop* or demand they get a warrant before proceeding further. Again, it bears repeating, Hill was not only silent in the face of the search, he *participated* in it. *See, nonexhaustively,* 19:26:50-55; 19:29:13-14; 19:30:45; 19:38:40-44; 19:40:30-35. It's scope may not have been well defined at the outset, but to the extent it expanded Hill repeatedly endorsed that expansion as the search continued.

Defendant did not raise the issue, but the Court did inquire about Rivera's reasoning for opening the opaque black plastic baggie. A bag that appears to contain something illegal and is not tied shut has been construed by other courts as being in "plain view," even where its contents are not immediately obvious. *See, e.g., United States v. Smith*, 2004 WL 574641 at *6 (S.D.N.Y. Mar. 23, 2014). Rivera testified that, in his experience, such baggies are commonly used to conceal narcotics and that he opened the unsecured bag because he suspected this one too contained illicit evidence. And the small, transparent bag of marijuana found on top of the pile of laundry, obviously, was in "plain view" as Rivera searched the bedroom.

Hill raised the specter of 'advanced interrogation tactics' at the hearing, focusing on Rivera's training and experience in lowering a suspect's guard and keeping him talking, to head off any objection to a search or, perhaps, induce an admission. But he offered no authority that such artifice and technique render a search illicit or a statement involuntary. Indeed, as described *infra* at n. 6, the very nature of a police-citizen encounter may involve 'psychological ploys' that do not, on their own, render

was voluntarily given and the scope of that consent was not exceeded, Hill's argument that all evidence garnered from the search must be suppressed fails. Doc. 32 at 12.

B.   **The Search Warrant**

Hill next contends that the search warrant, sought after he declined to sign the written consent to search form and the search was halted, is fatally flawed. Doc. 32 at 14. It is, after all, based on the initial search (which he argues was unlawful) and his own pre-arrest admission that he had smoked marijuana earlier that day. *Id*. Defendant argues that, at the time the statement was given, he was in a custodial situation and thus required a *Miranda*[5] warning prior to any questioning. Doc. 32 at 8. He was, he contends, not free to leave — though unfettered by handcuffs or other restrictions of his movement, Rivera "loom[ed]" over him when he sat down on the staircase in front of his home for a few moments before inviting Rivera into his apartment. *Id*. Thus, Hill concludes, his statement that he had smoked marijuana a few hours before cannot be admitted and cannot form the basis of probable cause in

---

an interaction custodial or coercive.

[5]   *See Miranda v. Arizona*, 384 U.S. 436 (1966).

the warrant affidavit and application. But even when afforded the opportunity at the hearing, defendant did not rebut Rivera's credible testimony or the video evidence supporting a characterization of their encounter as calm, amiable, and cooperative. Nothing about their interactions indicated Hill, or indeed any reasonable person, would not have felt "free to decline the officers' requests or otherwise terminate the encounter." *Fla. v. Bostick*, 501 U.S. 429, 436 (1991).[6] Defendant has not demonstrated he was in custody such that a *Miranda* warning was required.[7]

---

[6]  Indeed, Hill emphasizes the inherently coercive nature of a police-citizen encounter. But though there are coercive aspects to *any* police request to interview a citizen suspected of a crime, *see Miranda*, 384 U.S. at 455 ("the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals"), *Miranda* applies only to questioning "initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id*. at 444. Certainly, "coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Id*. at 448 (quotes and cite omitted). *Miranda* too does not require "overt physical coercion or patent psychological ploys" before requiring "appropriate safeguards at the outset of the interrogation to insure that the statements were truly the product of free choice." *Id*. at 457. It does, however, require that the suspect is *in custody*. Put differently, the mere description of Hill and Rivera's encounter as 'inherently coercive' does not *per se* render it 'custodial.'

[7]  To the extent defendant waves at an argument that his voluntary, pre-Mirandized statement 'taints' his subsequent consent to search his apartment, that unbriefed contention too fails. As discussed above, Hill was not in custody when he made the statement so no *Miranda* warning was necessary. Moreover, as discussed *infra*, a *Miranda* violation does not *per se* taint a suspect's consent to search or the physical items garnered in that search. *See United States v. Sangineto-Miranda*, 859 F.2d 1501, 1519 (6th Cir. 1988); *see also United States v. Patterson*, 812 F.2d 1188, 1193

Even then, the failure to Mirandize a suspect does not preclude pre-*Miranda* voluntary admissions in determining probable cause. *See Patterson,* 812 F.2d at 1193 (pre-*Miranda* statements could be used in affidavit for search warrant to establish probable cause), *cert. denied*, 485 U.S. 922 (1988); *Sangineto-Miranda*, 859 F.2d at 1516 (suppression is not compelled merely because "nontestimonial evidence [was] proximately derived from a *Miranda* violation."), citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (the *Miranda* presumption of compulsion, although "irrebuttable" for purposes of the Government's case in chief, does "not require that the statements and their fruits be discarded as inherently tainted"); *United States v. Morales*, 788 F.2d 883, 885-86 (2d Cir. 1986) (pre-*Miranda* statements could be used in determining probable cause to arrest). In short, the warrant could permissibly have been (and was) based on Hill's admission, regardless of whether he was Mirandized before it was made.

The warrant was also issued based on an unidentified complainant's report of recurring illegal activity at Hill's apartment and

---

(9th Cir. 1987) (pre-*Miranda* statements could be used in determining validity of consent to search). Defendant has not mounted any argument indicating the contrary.

Rivera's report, "based on [his] training and experience," of the "strong smell of marijuana" coming out of the apartment. Gov't Exh. 1 at 4. Hill does not seriously challenge either fact. As noted by the Government, the smell of marijuana alone provides "probable cause to believe that a crime had been committed." *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982). Hill notes that no other agent is heard complaining of an overwhelming marijuana smell (doc. 32 at 16), but does not undermine or dispute Rivera's testimony that he smelled marijuana. Hill does not even mention the complainant's police report.

This Court must employ an exceedingly deferential standard when reviewing the state magistrate's probable cause determination. A reviewing court's task is not to make a *de novo* finding of probable cause but rather to decide whether the issuing magistrate — whose assessment of the affidavit's factual presentation is entitled to "great deference" — had a "substantial basis" for finding probable cause. *Illinois v. Gates*, 462 U.S. 213, 236, 238-39 (1983); *United States v. Bradley*, 644 F.3d 1213, 1263 (11th Cir. 2011); *Cauchon v. United States*, 824 F.2d 908, 911-12 (11th Cir. 1987). Given the strong preference for warrant-based searches, a magistrate's "finding of probable cause should be sustained

in doubtful or marginal cases." *United States v. Scott*, 555 F.2d 522, 527 (5th Cir. 1977).

The state magistrate's probable cause determination clearly survives under this highly deferential standard. Between the complainant's report, Hill's statement, and Rivera's unambiguous recognition of the scent of marijuana, the factual presentation of the warrant affidavit sufficiently set forth probable cause to authorize a search of the premises.[8] Nor does the relatively quick turnaround by the state magistrate demonstrate anything but diligence: all of Hill's bluster and suspicions about the timestamps were contradicted by Rivera's clear, credible testimony that he completed the warrant affidavit and application, submitted it to the neutral state magistrate, and then waited until the magistrate had reviewed the application and hailed him for a videoconference. Then, the video recapitulates both the magistrate's finding of probable cause and his authorization of the search. Probable

---

[8] The warrant also set forth as probable cause to search a positive "free air" canine alert on Hill's vehicle. Gov't Exh. 1 at 4. Hill conceded his argument questioning the timing of the alert (*see* doc. 32 at 14) at the hearing, contradicted as it was by Rivera's credible testimony that the canine alert happened simultaneously as he was drafting the warrant affidavit and application and was thus incorporated into the documents submitted to the state magistrate. Even without the canine alert, which clearly only regards Hill's vehicle, probable cause to search Hill's *home* is established by the facts supporting the warrant.

cause to search was obvious within the four corners of the warrant application.

"Reasonable minds frequently may differ on the question of whether a particular affidavit established probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984). Reasonable jurists, indeed, often disagree on the robustness of probable cause set forth in state warrants, while still affirming their validity. *See, e.g., United States v. Kimble*, 2018 WL 4265349 at *3 (S.D. Ga. Aug. 16, 2018). No such charity is required here. The warrant survives defendant's probable cause challenge, supported as it is by his pre-*Miranda* statement, a witness report, and Rivera's detection of marijuana.

### III. CONCLUSION

In sum, Desmond Hill's motion to suppress evidence gathered during the initial, warrantless search and the later search pursuant to the warrant (doc. 32) should be **DENIED**. This Report and Recommendation (R&R) is submitted to the district judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3. Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.

The document should be captioned "Objections to Magistrate Judge's Report and Recommendations." Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; see *Symonett v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED,** this  1st  day of April, 2019.

_____
CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA